***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Dollar and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matter of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Ohio Casualty Group was the carrier on the risk.
3. The employee-employer relationship existed between the parties at all relevant times.
4. Plaintiff's average weekly wage was $340.38 per week, which yields a weekly compensation rate of $266.93.
5. The parties stipulated the following documentary evidence:
a. I.C. Forms,
b. Plaintiff's personnel file,
c. Answers to Interrogatories,
d. Plaintiff's job search records,
e. Medical records, and
f. Form 22.
7. Additional medical records from Dr. Anthony Defranzo were received into evidence following the hearing before the Full Commission.
8. The issues for determination are whether plaintiff contracted a compensable occupational disease, and if so, to what benefits plaintiff is entitled and whether plaintiff's right to benefits is barred pursuant to the Seagraves decision.
 ***********
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the Deputy Commissioner's hearing, plaintiff was 42 years old. Plaintiff was hired in 1998 by defendant-employer, a dry cleaner. Plaintiff initially worked as an assistant manager, and her duties involved customer service, taking orders, and completing paperwork. Before 2001, plaintiff did not experience any hand problems on the job.
2. In October 2001, a new store manager, Steve Plantone, was hired and implemented cost cutting measures. As a result, Mr. Plantone reduced plaintiff's work hours and reassigned her to pants presser duties because the store could not afford to have an assistant manager position. Plaintiff was offered but declined the opportunity to be trained for a store management position at another location. As a pants presser, plaintiff's duties included pressing 25 — 30 pairs of trousers per hour, which required her to make repetitive hand movements to line up creases, pinch seams, flip pants from one side to the other, use the pleat steamer and steam table, use a roller to remove lint, and use a hand iron. During the course of a six-hour shift, plaintiff pressed up to 180 pairs of pants, or about one pair of pants every four to five minutes.
3. In the summer of 2002, plaintiff began to experience hand symptoms while performing the pants presser job. Plaintiff also woke up at night due to numbness in her hands. Plaintiff initially sought treatment with Dr. Carlos de la Garza on September 23, 2002. Dr. de la Garza restricted plaintiff to lifting no more than 25 pounds and instructed her to follow up with her family phsycian, Dr. Scott Polster. On October 1, 2002, plaintiff saw Dr. Polster for hand problems relating to her work as a pants presser. Dr. Polster prescribed bilateral carpal tunnel splints.
4. Plaintiff informed Mr. Plantone of her hand problems and they completed an I.C. Form 19 on September 25, 2002. Defendant-carrier first sent plaintiff for an evaluation with Dr. David Hillsgrove, a board certified hand surgeon, on October 9, 2003.
5. On November 19, 2003, Dr. Hillsgrove ordered nerve conduction studies, which were normal of both upper extremities. On December 16, 2003, Dr. Hillsgrove diagnosed plaintiff with bilateral wrist tenosynovitis and noted that plaintiff's hand problems might be work related. At his deposition, Dr. Hillsgrove testified that, based upon plaintiff's pressing 20 to 30 pairs of pants per hour during an eight-hour workday, he was 100% confident that her job could be a causative factor in the development of tenosynovitis. He also stated that plaintiff had a higher percentage of risk of developing the condition than the general public not equally exposed. Dr. Hillsgrove further elaborated that if plaintiff had a left carpal tunnel release which improved her symptoms, the improvement would support the diagnosis of carpal tunnel syndrome.
6. Defendants also referred plaintiff to hand surgeon Dr. Stephen Sanford for an evaluation. On January 20, 2004, Dr. Sanford noted that plaintiff's job duties did not appear to demonstrate highly repetitive, forceful pinching and grasping hand or wrist activities and felt the cause of her condition was likely idiopathic. Dr. Sanford did not diagnose plaintiff with any cumulative trauma disorder or disease. Dr. Sanford did note, however, that plaintiff had a permanent partial impairment of two percent of the right and two percent of the left hand. At his deposition, Dr. Sanford reiterated his opinion that it was unlikely that plaintiff's job was responsible for her symptoms and he felt there was nothing on the videotape of plaintiff performing her job that would put plaintiff at a higher risk of developing carpal tunnel syndrome than the general public.
7. In March 2004, plaintiff sought treatment with board certified hand and plastic surgeon Dr. Anthony Defranzo. Again, nerve conduction studies were reported as negative. Dr. Defranzo suspected plaintiff had carpal tunnel syndrome, as well as tendonitis and trigger thumb. Dr. Defranzo felt that plaintiff's job duties might be causally related to the development of her carpal tunnel syndrome. After conservative treatment did not resolve plaintiff's symptoms, Dr. Defranzo performed a left carpal tunnel release and right trigger thumb release on August 30, 2004, and a right carpal tunnel release on December 13, 2004. On December 23, 2004, Dr. Defranzo noted that he was certain plaintiff had carpal tunnel syndrome, as she had such a good early response to the carpal tunnel release.
8. At his deposition, Dr. Defranzo testified that plaintiff's job was highly repetitive and that he was 100% certain that the most significant causative factor in plaintiff's development of carpal tunnel syndrome and right trigger thumb was her employment. Dr. Defranzo also stated that plaintiff was at an increased risk of developing carpal tunnel syndrome as compared to the general population who are not similarly exposed. Dr. Defranzo testified that plaintiff's having not performed the job in the 18 months prior to his treating her was not significant.
9. The Commission gives greater weight to the opinions of Dr. Defranzo and Dr. Hillsgrove than to Dr. Sanford, as Dr. Sanford saw plaintiff on only one occasion.
10. The Commission finds by the greater weight of the competent medical evidence in the record that plaintiff's tendonitis and carpal tunnel syndrome were caused by her employment and that she was at an increased risk for developing these conditions due to her employment.
11. The employer terminated plaintiff on October 4, 2002 for time clock violations. Plaintiff was terminated for violations of defendant-employer's personnel policy for which non-injured employees are also terminated. Prior to her termination, Mr. Plantone gave plaintiff oral and written warnings, as well as a suspension, for poor attendance, failing to read labels, and bringing in too many of her own clothes. Plaintiff was still under medical restrictions at the time of her termination. Plaintiff has been unable to find suitable employment since her termination, despite a reasonable job search. Plaintiff received unemployment benefits from October 17, 2003 until January 3, 2004.
12. Plaintiff would benefit from further treatment from Dr. Defranzo for her occupational disease.
13. Plaintiff has not reached maximum medical improvement.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. In order to qualify for compensation under the Workers' Compensation Act, a claimant must prove both the existence and the extent of disability.Hilliard v. Apex Cabinet Co., 305 N.C. 593, 290 S.E.2d 682(1982).
2. Plaintiff bears the burden of proving each element of compensability in order to prove the existence of an occupational disease within the meaning of N.C. Gen. Stat. § 97-53(13). This requires the plaintiff to show that (1) the disease must be characteristic of a trade or occupation; (2) the disease must not be an ordinary disease of life to which the public is equally exposed outside of the employment; and (3) there must be proof of causation. Hansel v. Sherman Textiles, 304 N.C. 44,283 S.E.2d 101(1981). Where the exact nature and probable genesis of a particular injury involves complicated medical questions removed from the ordinary experience of the layperson, only a qualified expert witness can give an opinion as to the nature and cause of the injury. Click v. PilotFreight Carriers, Inc., 300 N.C. 164, 265 S.E.2d 389 (1980).
3. In the present case, the greater weight of the evidence shows that plaintiff's carpal tunnel syndrome is the result of a disease that is characteristic of and peculiar to her particular trade, occupation or employment. In addition, the greater weight of the medical evidence showed that the condition is not an ordinary disease of life to which the public is equally exposed outside the employment. Therefore, plaintiff contracted a compensable occupational disease within the meaning of the law. N.C. Gen. Stat. § 97-53(13).
4. Plaintiff's termination from employment with defendant-employer is attributable to plaintiff's misconduct, unrelated to the compensable injury, for which a non-disabled employee would ordinarily be terminated. Therefore, plaintiff's termination on October 4, 2002 constitutes a constructive refusal to perform the work provided. Seagraves v. Austin Co.of Greensboro, 123 N.C. App. 228, 472 S.E.2d 397 (1996).
5. Under the Seagraves analysis, after an employer has proven that the employee's termination constitutes a constructive refusal of employment, an employee must then show that her inability to find other employment at wages comparable to those earned prior to the injury is due to the work-related disability. Seagraves v. Austin Co. of Greensboro, supra.
6. In the case at bar, the greater weight of the evidence shows that after her termination, plaintiff was capable of some work and made a reasonable, but unsuccessful, effort to find other employment. Demery v.Perdue Farms, Inc., 142 N.C. App. 259, 545 S.E.2d 485 (2001). Therefore, after October 4, 2002, plaintiff proved that she was disabled from employment due to the compensable injury. N.C. Gen. Stat. § 97-29;Seagraves v. Austin Co. of Greensboro, supra.
 7. Plaintiff is entitled to temporary total disability compensation atthe rate of $266.93 per week for the period from October 4, 2002 untilplaintiff returns to work or until further order of the Commission. N.C.Gen. Stat. § 97-29.
 8. Plaintiff is entitled to have defendants pay for medical expensesincurred or to be incurred as a result of the compensable injury as may berequired to provide relief, effect a cure or lessen the period ofdisability. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 9. Defendants are entitled to a credit for any unemployment benefits paidplaintiff from October 17, 2003 to January 3, 2004. N.C. Gen. Stat. §97-42.1
 *********** Based upon the foregoing stipulations, findings of fact, and conclusionsof law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, defendants shall pay temporary total disability compensation at the rate of $266.93 per week for the period from October 4, 2002 until plaintiff returns to work or until further order of the Commission. As much of said compensation as has accrued shall be paid in a lump sum.
2. Defendants shall pay for all medical, rehabilitation, and other expenses incurred or to be incurred by plaintiff as a result of the compensable occupational disease for so long as such evaluations, treatments, and examinations may reasonably be required to effect a cure, give relief, or lessen plaintiff's period of disability.
3. A reasonable attorney's fee of 25% of the compensation awarded to plaintiff in paragraph 1 above is hereby approved to be deducted from sums due plaintiff and paid directly to counsel. Thereafter, every fourth check shall be paid directly to counsel.
4. As plaintiff has not reached maximum medical improvement, this Opinion and Award does not address this issue. However, in the event that the parties should be unable to agree on the amount of permanent partial disability compensation, if any, which may be due plaintiff, either party may request a hearing from the Commission to resolve this matter.
5. Defendants are entitled to a credit for any unemployment benefits paid plaintiff from October 17, 2003 to January 3, 2004.
6. Defendants shall pay the costs.
This 31st day of August, 2005.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER